**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **KITTY S. LULL,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Case No. 11-CV-403-PJC |
| ) | |
| **MICHAEL J. ASTRUE, Commissioner of the** ) | |
| **Social Security Administration,** ) | |
| ) | |
| **Defendant.** ) | |

**OPINION AND ORDER**

Claimant, Kitty S. Lull ("Lull"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for disability insurance benefits and supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Lull appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Lull was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

**Claimant's Background**

Lull was 49 years old at the time she testified at the hearing before the ALJ on July 1, 2010. (R. 27-55, 131). Lull had last worked in March 2008 as a manager of a HUD property. (R. 32). She had started there as a maintenance worker in 1989 and had been manager since 1995. *Id.* She was dismissed in March 2008 for reasons that she believed were related to her depression and anxiety and her inability to "deal with people anymore." (R. 32-33, 38-39).

Lull said that she could not work due to mental and physical disabilities. (R. 30). Lull testified that her mental issues were more disabling than her physical issues. (R. 31). She said that she was depressed and that she had been working with a psychiatrist to find medications to effectively address her depression. (R. 32). She experienced panic attacks that she believed were due to abuse that she witnessed and she suffered as a child. (R. 33-34). She had between two and five panic attacks a day. (R. 37). During a panic attack, her heart beat fast and she felt as though she could not breathe. (R. 34, 37-38). She felt fear and an impulse to run. (R. 37-38). After a panic attack, she was exhausted. (R. 38). She had trouble dealing with authority figures due to her post-traumatic stress disorder ("PTSD"). (R. 53-54). She had difficulty expressing herself. *Id.* Lull testified that her depression made her unmotivated to do things that she needed to do. (R. 41). She had trouble sleeping due to nightmares. (R. 44). She had daytime drowsiness due to this trouble sleeping and due to side effects of medications. *Id.*

Regarding her physical problems, Lull said that she had pain from the center of her back and down her legs that made it difficult for her to walk and sit for long periods of time. (R. 30-31). She said that her chiropractor had told her she needed surgery, but she could not afford it. (R. 31). Lull said that she experienced a "flare up" of her back condition about once a month. (R. 49-50). When this happened, it caused a "blinding pain." *Id.*

2

Lull had previously had difficulty with GERD,[1] but at the time of the hearing that condition had improved due to medication. (R. 40). She still had nighttime episodes of a burning feeling that resulted in a need to throw up. (R. 43). She had diabetes, and if she didn't time her eating and her medications correctly, she had episodes during which she would shake, her vision would get blurry, and she had trouble thinking. (R. 43-44). She had injured her left foot and had surgery on it. (R. 45-46). Lull said that she continued to experience pain from the injury to her left foot. *Id.* Lull said that she had torn the rotator cuffs in both shoulders at separate times, and she had limited ability to reach or to work over her head. (R. 50-51).

Lull testified that on a typical day when she woke up she was very drowsy due to her medications. (R. 51). Her morning medications would also make her drowsy, and she said that she fought sleep all day long. (R. 51-52). When she did chores, such as doing dishes or vacuuming, she did them in spurts because she couldn't stand too long. (R. 52). She could fix her meals and take care of her personal hygiene. (R. 53). She watched television during the day, but she sometimes dozed off while doing so. *Id.*

Two pages of records appear to show that Lull was seen regularly by Thomas E. Cate, D.C. from 2002 through 2008. (R. 278-79). The record shows that her major complaints were her right hip, mid back, right shoulder, and headaches. *Id.*

Lull saw Michele Coulter, D.O. on January 9, 2007 with complaints of right upper quadrant pain and a heartburn feeling in the center of her chest. (R. 327-28). The record appears to indicate that physical examination showed pitting edema. (R. 327). She was diagnosed with hyperlipidemia, diabetes, degenerative disc disease, peripheral edema, and an abdominal hernia.

---

[1] Gastroesophageal reflux disease. Dorland's Illustrated Medical Dictionary 2142 (29th ed.).

(R. 328). Regarding the hernia, she was referred to a surgeon. *Id.*

Medical records show that Lull was in the Orthopedic Hospital of Oklahoma from March 12, 2007 to March 13, 2007 for laparascopic surgery to repair a "tiny mid epigastric hernia." (R. 196-219). The surgery also included lysis of adhesions, an appendectomy, and liver biopsy. *Id.*

Lull returned to Dr. Coulter on April 2, 2007, and she was diagnosed with pharyngitis and bronchitis, and her hypertension was noted to be stable. (R. 329-30). On May 10, 2007, Lull returned for evaluation of acid reflux. (R. 331-32).

Lull saw Michael J. Martin, M.D. on referral from Dr. Coulter on May 29, 2007 for complaints of nausea and vomiting. (R. 316-18). Dr. Martin thought that these complaints were probably due to reflux, but he recommended diagnostic studies to assess the severity. *Id.*

Lull returned to Dr. Coulter on July 6, 2007 to discuss test results. (R. 333-34). Diagnoses included GERD and chronic vomiting. (R. 334).

Lull was hospitalized at the Oklahoma State University Medical Center from July 20 to 22, 2007. (R. 257-77). She presented with chest pain and was admitted to rule out acute coronary syndrome. (R. 257). The conclusion of the medical staff was that her chest pain was most likely caused by gastrointestinal sources. *Id.*

Lull returned to Dr. Coulter on August 16, 2007 with a complaint of chronic vomiting. (R. 335-36). Diagnoses included gastritis, and Dr. Coulter appears to have discussed appropriate diet with Lull. (R. 336). On October 2, 2007, Lull returned with complaints of inability to sleep, nervousness, and excessive crying. (R. 337-38). Diagnoses included depression and insomnia. (R. 338). On October 23, 2007, Lull returned with a chief complaint of GERD and vomiting, but the record also says "Depression Psychosis Anger Rage." (R. 339-40). Lull had apparently run out of Ativan at the same time that she was experiencing stress from her roommate. (R. 339).

Diagnoses included GERD, stable depression, and general anxiety disorder. (R. 340). An additional note appears to reference incompetent esophageal sphincter. *Id.* On November 7, 2007, Lull's obesity and edema appear to have been referenced during examination. (R. 341-42).

Lull presented to Concentra Medical Centers on November 12, 2007 complaining that her left foot was injured when a man parked his electric scooter on her foot. (R. 280-315). An x-ray of Lull's left foot showed no evidence of acute fracture, but it did show plantar and posterior heel spurs. (R. 280). Lull attended physical therapy. (R. 283-315).

Lull returned to Dr. Coulter on February 22, 2008 with complaints of cough, vomiting, bodyache, and headache. (R. 343-44). Diagnoses included chronic sinusitis and GERD. (R. 344). She returned on April 7, 2008 for an evaluation of anxiety, and a note was made that she had been fired from work and was "real upset." (R. 345-46). She returned on July 1, 2008 with left shoulder pain after straining it while moving. (R. 347-48). Pitting edema was again noted on examination. (R. 347). Diagnoses included shoulder muscle spasm, impingement syndrome, elevated hypertension, and peripheral edema. (R. 348). On August 18, 2008, Lull needed medication refills and forms to be completed. (R. 349-50). A note appears to state that Lull was not checking her blood sugar levels and also that she could not afford to see the chiropractor and she was now experiencing back pain. (R. 349). The diagnosis was hypertension. (R. 350). On December 10, 2008, Lull returned regarding her left shoulder pain. (R. 370-71). Diagnoses were rotator cuff tear, GERD with hiatal hernia, diabetes, hyperlipidemia, and elevated hypertension. (R. 371).

Lull returned to Dr. Coulter on January 16, 2009, and a note appears to reflect that Lull was sad, hopeless, not motivated to do things, and experiencing crying spells. (R. 368-69). On February 25, 2009, diagnoses included hypertension, diabetes, and hyperlipidemia. (R. 366-67).

On March 19, 2009, Lull returned to Dr. Coulter with complaints of depression, panic attacks, and anxiety attacks. (R. 364-65). Diagnoses were depression and PTSD. (R. 365). Medications were adjusted, and a note appears to state that Lull was going to start counseling. *Id.*

Records from Family & Children's Services ("F&CS") reflect that Lull was seen by a clinician on July 2, 2009, and a treatment plan was developed. (R. 412-21). There is no indication that the treatment plan was signed by a physician. *Id.* The treatment plan reflects Axis I[2] diagnoses of PTSD and moderate, recurrent, major depressive disorder. (R. 419). Lull's Global Assessment of Functioning ("GAF")[3] was stated as 39. Lull was seen by Chariny Herring, D.O. on July 14, 2009. (R. 422-23). Dr. Herring's diagnoses[4] were recurrent moderate major depressive disorder and general anxiety disorder, and she included a note to rule out PTSD.

Lull saw Elka Serrano, M.D. at F&CS on October 13, 2009. (R. 432). Dr. Serrano said that Lull's mood was still sad, but her anxiety had improved, and her interests were "good." *Id.* Dr. Serrano's diagnosis was major depressive disorder, and she increased Lull's Paxil. *Id.* On

---

[2] The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

[3] The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id*. at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id*. A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*.

[4] The diagnoses also included polysubstance dependence "fsr." The text of Dr. Herring's entry states that Lull had been "sober since 10/1982." (R. 422).

6

December 18, 2009, Dr. Serrano continued the diagnosis of major depressive disorder and adjusted Lull's medications. (R. 434). On December 26, 2010, Dr. Serrano continued the diagnosis of major depressive disorder and added Abilify to Lull's medications. (R. 435). On April 27, 2010, Dr. Serrano continued the diagnosis of major depressive disorder and added Ambien for sleep. (R. 436).

On July 6, 2010, Thomas Cate, D.C. wrote a "To Whom It May Concern" letter stating that he had been treating Lull for several years. (R. 438). He said that to his knowledge Lull had degenerative disc disease, and he believed that she had a herniated disc and should therefore have an MRI. *Id.*

Agency examining consultant Stephanie C. Crall, Ph.D. completed a mental status examination and report on March 5, 2009. (R. 360-63). Dr. Crall noted that Lull was tearful and appeared depressed. (R. 361). She said that Lull's information "was viewed as being valid and reliable." *Id.* Dr. Crall stated that in her opinion Lull's "ability to engage in work-related mental activities, such as sustaining attention, understanding, and remembering and to persist at such activities was likely adequate for simple and some complex tasks, as functional limitations appeared more likely due to physical rather than to mental impairments." (R. 362). On examination, Dr. Crall said that Lull's functional memory was not intact. *Id.* Dr. Crall's diagnoses were major depressive disorder, moderate, chronic; and PTSD in partial remission. (R. 363). She said that she based those diagnoses on Lull's "clinical presentation as well as her reported history and symptoms." *Id.*

Agency nonexamining consultant Cynthia Kampschaefer, Ph.D. completed a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Assessment on March 24, 2009. (R. 372-89). For Listing 12.04, Dr. Kampschaefer noted Lull's mood disturbance with

depressive syndrome and her depression not otherwise specified. (R. 375). For Listing 12.06, Dr. Kampschaefer noted Lull's anxiety. (R. 377). For the "Paragraph B Criteria,"[5] Dr. Kampschaefer found that Lull had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation. (R. 382). In the "Consultant's Notes" portion of the form, Dr. Kampschaefer summarized Dr. Crall's mental status examination at some length. (R. 384).

In her Mental Residual Functional Capacity Assessment, Dr. Kampschaefer found that Lull was markedly limited in her ability to understand, remember, and carry out detailed instructions. (R. 386). Dr. Kampschaefer also found Lull to be markedly limited in her ability to interact appropriately with the general public. (R. 387). She found no other significant limitations. (R. 386-87). Dr. Kampschaefer said that Lull could perform simple tasks with routine supervision, she could relate to supervisors and peers on a superficial work basis, she could not relate to the general public, and she could adapt to a work situation. (R. 388).

Agency examining consultant Seth Nodine, M.D. completed an examination of Lull and a report dated January 3, 2009. (R. 352-59). Lull's chief complaints were GERD, chronic vomiting, and shoulder and back pain. (R. 352). During Dr. Nodine's interview, Lull vomited "clear fluid/phlegm" into a trash can. (R. 353). Dr. Nodine noted pain with ROM of Lull's

---

[5]There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

lumbar spine and left shoulder. (R. 354). He also noted her obesity. *Id.* His assessments were GERD "with vomiting by [Lull's] history," hypertension, dyslipidemia, diabetes, anxiety, "[b]ilateral rotator cuff tears and pain by history with evidence [of] pain today," and umbilical hernia. *Id.* Dr. Nodine added the comment that he "question[ed] a psychiatric component to some of her conditions." *Id.*

As part of the agency review process, Brian R. Boggs, M.D. requested x-rays on March 24, 2009. (R. 390). The x-rays were taken on May 20, 2009. (R. 391-96). X-rays of Lull's lumbar spine showed the following:

> Osteoarthritis of the lower lumbar spine from L4 through S1. Anterior osteophytes of the vertebral body endplates in the lower thoracic and upper lumbar spine. These bridge and connect approximately five-six levels and probably represent diffuse idiopathic skeletal hyperostosis.

(R. 391). X-rays of Lull's right shoulder showed minimal osteoarthritic changes of the acromioclavicular joint. (R. 392). X-rays of her left shoulder showed mild osteoarthritic changes of the acromioclavicular joint without acute bony abnormality. (R. 392-93). X-rays of her left hip showed mild osteoarthritic and degenerative joint disease changes without acute bony abnormality. (R. 393-94). X-rays of Lull's right knee were normal, and those of her left knee showed mild degenerative joint disease of the medial left knee. (R. 395-96).

Dr. Boggs, as a nonexamining agency consultant, completed a Physical Residual Functional Capacity Assessment dated May 29, 2009. (R. 403-10). Dr. Boggs found that Lull had the exertional capacity to perform light work. (R. 404). In the section for narrative comments, Dr. Boggs summarized Dr. Nodine's report at some length. (R. 404-05). Dr. Boggs also referenced some of Lull's treating records. (R. 405). He summarized her activities of daily living. *Id.* He summarized the results of the x-rays. *Id.* He said that Lull's "allegations of

9

physical limitations are partially credible and are considered in formulating this RFC." *Id.* He found that no other limitations were established. (R. 405-10).

## Procedural History

Lull filed applications for Title II disability insurance benefits and for Title XVI supplemental security income benefits in September and October 2008 under the Social Security Act, 42 U.S.C. §§ 401 *et seq.* (R. 131-36). Lull alleged onset of disability as of March 21, 2008. (R. 131). The applications were denied initially and on reconsideration. (R. 69-77, 81-86). A hearing before ALJ John Volz was held on July 1, 2010 in Tulsa, Oklahoma. (R. 27-62). By decision dated August, 2010, the ALJ found that Lull was not disabled. (R. 10-22). On April 28, 2011, the Appeals Council denied review of the ALJ's findings. (R. 1-4). Thus, the decision of the ALJ represents a final decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[6] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

---

[6] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his

(detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'"  *Id.*, (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)).  The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner.  *Hamlin,* 365 F.3d at 1214 (quotation omitted).

---

ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work.  20 C.F.R. § 404.1520.

**Decision of the Administrative Law Judge**

The ALJ found that Lull met insured status requirements through December 31, 2012. (R. 12). At Step One, the ALJ found that Lull had not engaged in substantial gainful activity since her alleged onset date of March 21, 2008. *Id.* At Step Two, the ALJ found that Lull had severe impairments of osteoarthritis, degenerative joint disease, diabetes, major depression, and anxiety. (R. 13). At Step Three, the ALJ found that Lull's impairments did not meet any Listing. (R. 14).

The ALJ determined that Lull had the RFC to perform light work "except limited to no repetitious interaction with the general public or coworkers, and confined to simple, uncomplicated tasks with routine supervision." (R. 16). At Step Four, the ALJ found that Lull could not perform any past relevant work. (R. 21). At Step Five, the ALJ found that there were jobs in significant numbers in the national economy that Lull could perform, considering her age, education, work experience, and RFC. *Id.* Thus, the ALJ found that Lull was not disabled from March 21, 2008 through the date of the decision. (R. 22).

**Review**

Lull asserts three arguments. First, she argues that the ALJ's decision is erroneous in its consideration of the opinion evidence. Second, she argues for reversal because the ALJ "improperly disregarded the testimony of the vocational expert" (the "VE"). Plaintiff's Opening Brief, Dkt. #12, p. 2. Third, Lull argues that the ALJ's credibility assessment was flawed. Because the undersigned finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements, the ALJ's decision is affirmed.

**Issues Relating to Opinion Evidence and the VE's Testimony**

Lull's arguments are limited to the evidence of nonexamining consultants. Generally, the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). A nonexamining physician's opinion is an acceptable medical source that the ALJ is entitled to consider. *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007); *Weaver v. Astrue*, 353 Fed. Appx. 151, 154-55 (10th Cir. 2009) (unpublished).

First, Lull states that the ALJ disregarded the box checked by Dr. Boggs indicating that Lull could sit for less than six hours in an eight-hour day. This argument is not persuasive because the ALJ found that Lull could perform light work, and the definition of light work does not include a requirement that an individual can sit for up to six hours. See 20 C.F.R. §§ 404.1567(b) and 416.967(b). Further the VE testified that the jobs that he identified, which the ALJ relied on at Step Five, would not be affected by an inability to sit for up to six hours. (R. 56-58). Because the ALJ's RFC determination for light work does not "disregard" the finding of Dr. Boggs that Lull could not sit for six hours a day, Lull's argument fails.

In this section of Plaintiff's Opening Brief, counsel for Lull repeat an argument that they have made in multiple cases. They insist that if the agency consultant finds a moderate impairment of the Paragraph B Criteria, then that consultant must make findings in the Mental Residual Functional Capacity Assessment that correlate to that Paragraph B Criteria finding. Plaintiff's Opening Brief, Dkt. #12, p. 3. In Lull's case, they want the finding that she has a moderate difficulty in maintaining concentration, persistence, or pace to correlate to two functional limitations: (1) a finding that she has a limitation in her ability to maintain attention and concentration for extended periods; and (2) a finding that she has a limitation in her ability to complete a normal workday or workweek without interruptions from psychologically based

symptoms. *Id.*

The argument that Paragraph B Criteria necessarily implicate any particular functional limitation listed in the Mental Residual Functional Capacity Assessment is specious. The Tenth Circuit rejected this argument by Lull's counsel in an unpublished case decided in 2006. *See Heinritz v. Barnhart*, 191 Fed. Appx. 718, 721-22 (10th Cir. 2006) (unpublished). In *Heinritz*, counsel had asked the VE if someone with a marked limitation in the domain of concentration persistence, or pace could work, and the VE had testified that the limitation precluded competitive work. *Id.* at 721. The Tenth Circuit said that while the agency consultants had found a marked limitation of concentration, persistence, or pace for the Paragraph B Criteria on the Psychiatric Review Technique form, those consultants found that only three of twenty specific mental activities were impaired on the Mental Residual Functional Capacity Assessment form. The court found that the ALJ's RFC was consistent with these specific findings of the consultants, and therefore there was no reversible error. *Id.* at 721-22.

Counsel for Lull attempt to merge the Paragraph B Criteria reflected on the Psychiatric Review Technique form and used at Step Three with the functional criteria reflected on the Mental Residual Functional Capacity Assessment form that is used at Steps Four and Five. This attempt disregards the different purposes of these forms. In 1996, the Social Security Administration explained these different purposes:

> The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the [Psychiatric Review Technique form].

14

Social Security Ruling 96-8P, 1996 WL 274184 *4.  The undersigned rejects the attempts of counsel to blur the lines between these two forms and their different purposes.  Here, the ALJ addressed Lull's mental functions by limiting her to "no repetitious interaction with the general public or coworkers, and confined to simple, uncomplicated tasks with routine supervision."  (R. 16).  This finding by the ALJ is consistent with the findings of Dr. Kampschaefer on her Mental Residual Functional Capacity Assessment.  (R. 386-89).  Lull's arguments that the ALJ failed to acknowledge "inconsistencies" in Dr. Kampschaefer's findings are without merit.

  The ALJ's evaluation of the opinion evidence complied with legal requirements and was supported by substantial evidence.

  In the second section of her Opening Brief, Lull attempted to fashion a separate argument that the ALJ ignored testimony of the VE.  This argument, however, is duplicative of Lull's arguments previously discussed in her attempt to merge the Paragraph B Criteria finding into the Step Five functional limitations.  She argues that questions to the VE that were based on the Paragraph B Criteria finding of a moderate limitation of concentration, persistence, or pace elicited testimony that shows that a person with that limitation is unable to work.  Plaintiff's Opening Brief, Dkt. #12, p. 4.  As explained above, the Tenth Circuit rejected this very argument in *Heinritz*, 191 Fed. Appx. at 721-22.  The ALJ's RFC was consistent with the substantial evidence provided by Dr. Kampschaefer's opinions regarding Lull's mental functional capacity, and the VE's testimony based on that RFC provides substantial evidence supporting the ALJ's Step Five finding.

  The ALJ's findings at Step Five were supported by substantial evidence and complied with legal requirements.

**Credibility**

Credibility determinations by the trier of fact are given great deference. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2001). In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

The ALJ gave an introductory sentence[7] to his credibility assessment, and he then summarized some of the medical evidence. (R. 17-18). The ALJ then provided several separate paragraphs giving reasons why he found Lull to be less than fully credible. (R. 19-20). These sections of the decision fulfill the ALJ's obligation to give specific reasons that are closely linked to substantial evidence. *Kepler*, 68 F.3d at 391.

Faced with this thorough and specific credibility assessment, Lull engages in scattershot arguments. Plaintiff's Opening Brief, Dkt. #12, pp. 6-10. The first cluster of arguments addresses the ALJ's use of activities of daily living as one facet of his credibility assessment. None of these arguments is persuasive, and most miss the point entirely. The ALJ pointed out a

---

[7] Lull's faults the introductory language used by the ALJ: "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 17). While this language might have been "meaningless boilerplate," it was merely an introduction to the ALJ's analysis and was not harmful. *See Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1170 (10th Cir. 2012) (use of boilerplate language in a credibility assessment is problematic only "in the absence of a more thorough analysis") (further quotations omitted).

lot of Lull's activities not in an attempt to correlate "with the actual ability to do labor," as Lull has asserted, but to address her complaint of disabling depression. As the ALJ noted, her activities were more extensive than one would expect in somebody who asserts that her depression and anxiety are totally disabling. (R. 19). The ALJ's analysis of Lull's activities of daily living was sufficient to establish one of his specific reasons closely linked to substantial evidence.

Lull next attacks the ALJ's analysis of her pain and the reasons why he found it to be less than totally disabling. The ALJ said that the treatment that Lull had received was essentially routine and conservative in nature and was not the type of treatment that would be expected for somebody who was totally disabled. (R. 19). The Tenth Circuit affirmed a similar finding by an ALJ in *Mayberry v. Astrue*, 461 Fed. Appx. 705, 710-11 (10th Cir. 2012) (unpublished). The undersigned finds that there was no error in this portion of the ALJ's decision, and the lack of extensiveness of Lull's treatment was one specific reason linked to substantial evidence that supported the ALJ's credibility assessment.

The ALJ next noted inconsistencies in Lull's descriptions of side effects from her medications. (R. 19). Lull's attacks on this portion of the ALJ's decision are difficult to decipher. There was no error in the ALJ's discussion of side effects of Lull's medications.

The ALJ pointed out two specific inconsistencies in Lull's statements about her medical conditions. (R. 19-20). Lull argues that the ALJ misunderstood these two instances. These arguments constitute "an invitation to this court to engage in an impermissible reweighing of the evidence and to substitute our judgment for that of the Commissioner," and the undersigned declines that invitation. *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005).

Lull mentions that she was assessed with a GAF of 39 and in passing argues that the ALJ should not have ignored this score. In a recent case with facts similar to those of Lull's case, the Tenth Circuit rejected an argument that the ALJ had erred by failing to mention GAF scores. *Butler v. Astrue*, 412 Fed. Appx. 144, 145-47 (10th Cir. 2011) (unpublished). In *Butler*, mental health counselors assigned GAF scores ranging from 44 to 46, while a consultative examiner gave the claimant a GAF of 70. The Tenth Circuit affirmed the ALJ's decision, finding that the ALJ had considered all of the evidence, even though he had not specifically included the lower GAF scores in his discussion. *Id.* In Lull's case, the Court adopts the reasoning of the Tenth Circuit in *Butler* and finds that the ALJ's failure to explicitly include the GAF score of 39 was not fatal to his decision. Moreover, the document on which the score of 39 appears has no indication that it was reviewed or given input by an acceptable medical source. The score was also based on an initial interview with Lull rather than based on a longitudinal treating relationship. Under these circumstances, the ALJ did not err by failing to specifically recite the GAF score.

Lull argues that the ALJ should have given her credit for several items, such as several records indicating that she was tearful. She also states that Dr. Crall's statement that she was cooperative, open, and honest, should be weighed in her favor, along with the fact that none of her treating physicians have stated that she exaggerates her symptoms. None of these arguments affects the credibility assessment, which was based on substantial evidence. *Miller ex rel. Thompson v. Barnhart*, 205 Fed. Appx. 677, 681 (10th Cir. 2006) (unpublished) (claimant disputed ALJ's view of evidence and relied on other evidence, but court declined to reweigh evidence).

Thus, the ALJ gave legitimate reasons for his credibility assessment, and those reasons were closely linked to substantial evidence. *Kepler*, 68 F.3d at 391; *Keyes-Zachary*, 695 F.3d at 1167 ("common sense, not technical perfection, is our guide").

## Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied. The decision is **AFFIRMED**.

Dated this 26th day of December 2012.

Paul J. Cleary
United States Magistrate Judge